FILED
MAY 29 2020
PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

UNITED STATES DISTRICT COURT
FOURTH DISTRICT COURT
RALEIGH, NORTH CAROLINA

| | |
|---|---|
| Webster Douglas Williams, III ) | Case No.: 5:20-CT-3189 |
|               Plaintiff ) | |
| v. ) | **CIVIL RIGHTS COMPLAINT PURSUANT** |
| ) | **TO BIVENS v. SIX UNKNOWN NAMED** |
| The following staff members of ) | **AGENTS OF FEDERAL BUREAU OF** |
| the Federal Bureau of Prisons: ) | **NARCOTICS; 42 USC § 1983; THE** |
| National Inmate Appeals Ian ) | **AMERICANS WITH DISABILITIES ACT;** |
| Connors; Regional Director D.J. ) | **THE REHABILITATION ACT AND** |
| Harmon; Regional Officer ) | **28 USCS § 1331** |
| Matthew W. Mullady; Butner LSCI ) | |
| Warden Donna Smith; Butner LSCI ) | |
| Associate Warden Engle; Butner ) | |
| LSCI Unit Manager D. Willis; ) | |
| Butner Granville A Counselor ) | |
| A. Williams; Butner LSCI Wake ) | |
| Unit Counselor J. Wade; Butner ) | |
| LSCI Lieutenant H. Cintry (sp?) ) | |
| Butner LSCI Lieutenant Ngo; ) | |
| each in their official and ) | |
| individual capacities. ) | |
| Federal Bureau of Prisons ) | |
| Director Inch; Federal Bureau ) | |
| of Prisons Assistant Director ) | |
| Thomas R. Kane, in their ) | |
| official capacities as supervi- ) | |
| sors to the above named staff ) | |
| and as individuals. ) | |
| Any successors to the above ) | |
| named positions. ) | |
|               Defendants ) | |

1

## JURISDICTION

1. This Honorable Court has jurisdiction to entertain civil rights actions regarding federal questions from 28 USC § 1331. See **Glover v. South Carolina**, 2016 US Dist. LEXIS 186498 (4th Cir. 2016).

2. The First Amendment of the United States Constitution also confers jurisdiction, inasmuch as it confers to United States citizens the right to petition the government for a redress of greivances.
   "Inmates have First Amendment Constitutional protection even if convicted and imprisoned." **O'Lone v. Estate of Shabazz**, 482 US 342, 348 (1987).

3. Existance of jurisdiction implies duty to exercise it, and that it's exercise might be onerous did not militate against that implicaiton. **Second Employers' Liability Cases**, 223 US 1, 56 L. Ed. 327, 32 S. Ct. 169 (1912).

## LIBERAL INTERPRETATION

4. The Plaintiff brings this motion as a pro se litigant. A pro se pleading is held to a less stringent standard than more formal documents drafted by attorneys. **Haines v. Kerner**, 404 US 519, 520, 92 S. Ct. 594 (1972); **Estelle v. Gamble**, 429 US 97, 97 S. Ct. 285 (1970).

5. A pro se movant may be dismissed only when it appears he can prove no set of facts that would entitle him to relief. **Erikson v. Pardus**, 551 US 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (4th Cir. 2007).

## PLAINTIFF SEEKS A PRELIMINARY INJUNCTIVE ORDER

6. The Plaintiff seeks a preliminary injunctive order from this Honorable Court prohibiting transfer to a different Bureau of Prisons facility consistent with the First Step Act requirement to house inmates within 500 road miles of home. This provision promotes rehabilitation through family visitation and interaction. There is no other medically-qualified FBOP institution within the 500 road mile limit from Myrtle Beach, SC, which comports with the medical care level required by the Plaintiff's serious medical conditions.

7. The Plaintiff suffers from:
    1) Essential Thrombocythemia - a very rare neoplasm (cancer) of the bone marrow.
    2) Stage 3 Chronic Kidney Disease.
    3) Bilateral pitting edema.
    4) Hypertension (high blood pressure).
    5) Spells of blindness (Amaurosis Fugax).
    6) Anemia.
    7) Gout.
    8) Severe divirticulosis.
    9) Sleep apnea.
    10) Duypuytrens Syndrome/contracture.
    11) Other serious health issues.

    These illnesses require frequent visits with medical care providers that would be difficult to maintain at a non-medical facility. The Plaintiff is qualified for placement in, and is housed in (since September, 2015), Low Security housing. It is unclear whether the Plaintiff is Care Level 3 or Care Level 4 based on conflicting information in the Plaintiff's files.

8. Plaintiff has had an exemplary conduct record until he received the instant incident report, regularly takes and teaches ACE classes, has kept steady employment, and now appeals the current

3

disciplinary action because it conflicts with the Americans with Disabilities Act, the Rehabilitation Act, and causes certain harm to the Plaintiff (described later in this motion). As an ACE instructor, the Plaintiff teaches useful skills to other inmates that they may implement upon release, such as an electrical class, and a proposed small engine repair class for which the Plaintiff has created a cirriculum.

9. The FBOP has a checkered history of retaliatory transfer (colloquially known to inmates as "deisel therapy" or "cart-wheeling") by transferring inmates who initiate lawsuits against staff. Any transfer of the Plaintiff would place him further than the 500 road mile limit from home specified in the First Step Act, making family visits more difficult if not impossible, and would damage the Plaintiff's rehabilitative efforts, while causing the Plaintiff and his family unnecessary burden and hardship. The reason any transfer would be greater than 500 miles is because of the Plaintiff's requirement for medical care consistent with his serious chronic illnesses, and the type of care required by the Plaintiff only being available at select FBOP facilities; all comparable medical FBOP facilities exceed the 500 mile limit from home expressed in the First Step Act.

10. Plaintiff therefore seeks an immediate injunction and order prohibiting involuntary transfer. The Plaintiff cites:
   **Washington v. FBOP**, 2018 U.S. Dist. LEXIS 198695 (4th Cir. 2018) as an example that retaliatory transfers have occurred and courts in the Fourth Circuit do grant orders of protection from same. Washington was granted an injunction prohibiting transfer from Butner due to medical reasons after he had been transferred as many as nine times for retaliatory reasons, which prevented the completion of his administrative remedy and civil lawsuit.

4

## INTRODUCTION

11. The Plaintiff is a 61 year old male federal inmate with 13 years remaining (approximately) on a 27 year sentence. He has been housed at Butner, LSCI, since September 15, 2015. The Plaintiff suffers from a litany of serious medical conditions, requiring that he be housed in a medical facility, such as Butner, LSCI. The Plaintiff was certified disabled by the State of South Carolina on July 5, 2003, due to amaurosis fugax (random, temporary spells of blindness) caused by his very rare form of bone marrow cancer.

12. The Plaintiff, Webster Douglas Williams, III, now comes before this Honorable Court with a greivance that the defendants in this case, as individuals, and collaboratively as a group, entity, agency, and/or representatives thereof, under color of law, took punitive and retaliatory action against the Plaintiff because he exercised a right specifically enumerated as a protected action by the Americans with Disabilities Act, and inferred by The Rehabilitation Act.

13. Butner, LSCI, Granville Unit Manager D. Willis knowingly issued a command to the Plaintiff which he was unable to follow, in a careless and indifferent manner, which either knowingly or unknowingly, could have caused the Plaintiff physical injury due to Plaintiff's Stage 3 Chronic Kidney Disease. Unit Manager Willis attempted to stop the Plaintiff's natural and normal bodily function, which at the time, was intensified beyond the ability of the Plaintiff to control due to prescribed medications which artificially stimulated the Plaintiff's normal biological functions causing a requirement to urinate far in excess of a normal person.

14. When the Plaintiff could not control his urinary incontinence, and took action to release his urine into a toilet instead of upon himself or onto the floor, Unit Manager D. Willis attempted to deny

5

the Plaintiff relief by ordering him to immediately return to his room (cube). Unit Manager Willis intended to deprive the Plaintiff of his ability to conduct an innate physical function compelled due to the Plaintiff's physiological response to a prescribed diuretic (Lasix/furosemide).

15. The command to return to the Plaintiff's cube/room was initiated by Unit Manager D. Willis due to (his words), a "body alarm". The Plaintiff had been incarcerated at Butner for four (4) years, and had never once heard of a "body alarm" or heard the term used. Plaintiff was only made aware of the term after receiving a "disciplinary action report".

16. The Plaintiff was, at the time, tending to the chemically-induced requirement to urinate caused by Lasix/furosemide, a powerful diuretic.

17. When the Plaintiff exited the restroom, he was confronted by Unit Manager D. Willis, who asked why the Plaintiff "refused to obey my order". The Plaintiff responded with these exact words:
    "I take water pills, and I had to go to the bathroom."
This informed Unit Manager D. Willis that the Plaintiff was, in fact, tending to and under the uncontrollable urge to urinate caused by the Plaintiff taking prescription diuretics, and had to use the bathroom immediately. The Plaintiff had no choice in the matter.

18. Unit Manager D. Willis seemed oblivious to the Plaintiff's chemically-induced mandate to urinate immediately, and cause the Plaintiff humiliation and embarrassment because of his disability.

19. Defendant D. Willis ignored the Plaintiff's explanation as to why he had an immediate need to urinate, and made a conscious decision to ignore the Plaintiff's disability and deprive him of <u>reasonable accomodation</u>, punishing the Plaintiff in a manner so as to stifle, repress, opress, hinder, and restrain the Plaintiff from tending to his unquestionable medical disability in the future.

6
Case 5:20-ct-03189-FL   Document 1   Filed 05/29/20   Page 6 of 20

20. Unit Manager D. Willis wrote a disciplinary report against the Plaintiff which purposefully omitted the fact that the Plaintiff informed him that he "takes water pills", which made the Plaintiff's decision to urinate seem to be an act of choice, which it was not. This omission in Unit Manager Willis's report was willful, and intended to influence and manipulate other staff responsible for administering punishment to the Plaintiff.

21. Unit Manager D. Willis accused the Plaintiff of "Refusing to Obey an Order", offense code #307, which caused the Plaintiff to suffer the loss of telephone privileges beginning immediately, for one month. However, the punishment meted out to the Plaintiff goes far beyond de minimus infliction of punishment. The Plaintiff is now subject to increasingly harsher punishment for any future minor infractions because the disciplinary report will remain in the Plaintiff's folder, causing gross mischaracterization of the Plaintiff as an inmate who refuses to follow orders. Allowing the disciplinary action to stand will tarnish the Plaintiff's otherwise exemplary record, and could jeopardize the Plaintiff's eligibility for Elderly Offender Home Confinement when the Plaintiff becomes eligible.

22. In addition to being wrongfully sanctioned for tending to his medical disability, on appeal, the UDC appellate board consisted of staff directly subordinate to Unit Manager Willis in violation of FBOP Policy Statement 1330.18/13(b), which requires that a UDC hearing be conducted by staff that are **not** subordinate to the issuing staff member to maintain an appearance of neutrality. The Plaintiff was essentially exposed to a "Star Chamber" hearing, where the appeals board conducting the hearing could have been disciplined by Unit Manager D. Willis if it failed to approve of his actions. The Plaintiff notified FBOP staff throughout the Administrative Review process (BP-8, BP-9, BP-10, BP-11), but the abuse of process was permitted to stand. The UDC hearing was conducted by counselors A. Williams and J. Wade, both subordinates of Unit Manager D. Willis.

7

23. When the Plaintiff attempted to provide copies of the Americans with Disabilities Act to Counselors A. Williams and J. Wade to show that his actions were "protected conduct", they pushed it back and refused to look at it. When the Plaintiff told them that Unit Manager Willis's report omitted the fact that the Plaintiff informed Mr. Willis that he had "taken water pills, and had to go to the bathroom", Counselor Wade told the Plaintiff: "Who do you think we're going to believe? One of us or an inmate?", it was clear that staff intended to respond carelessly and indifferently, abusing the process.

## RULE(S) GOVERNING THIS MOTION

24. The Americans with Disabilities statute, **42 USC § 12102(2)(B)** defines what a disability is:
    As used in this Act:
    (2) Major Life Activities:
    (B) **Major Bodily Functions**. For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including, but not limited to, functions of the... **bladder**... (other bodily functions omitted for brevity).

25. There is no legal doubt but that the medical necessity of emptying the bladder is a protected bodily function under the ADA for a disabled person who suffers from Chronic Kidney Disease. "Holding it" can cause unnecessary damage to already-damaged kidneys.

26. **42 USC § 12102(4)(A)** states that:
    "The definition of a disability in this Act shall be construed in favor of broad coverage of individuals under the Act, to the maximum extent permitted by the terms of this Act."
    **and**
    **42 USC § 12102(4)(C):**
    " An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability."

27. The Federal Bureau of Prisons is granted no waivers to circumvent the ADA with the sole exception of "genuine penological interests", which did not apply during the complained of incident. **42 USC § 12131(1)(B)** states:
    "The term "public entity" means-- any department, agency... or other instrumentality of a State or States or Local Government."

28. The ADA **requires "reasonable modifications to rules, policies, or practices"** for disabled individuals. See **42 USC § 12131(2).**

9

29. The Plaintiff asserts he is entitled to judgement as a matter of law.


## INCIDENT DETAILS

30. On February 28, 2019, the Plaintiff arose as usual at 6:00AM to prepare for work. As part of the Plaintiff's daily routine, he takes 40Mg of Furosemide (Lasix) at approximately 6:30AM, along with 16 doses of other medications and vitamins. Furosemide is a powerful diuretic. Plaintiff takes Furosemide to combat bilateral pitting edema (fluid buildup in the legs) caused by heart damage brought on by anagrelide (Agrylin), an anti-platelet drug the Plaintiff takes for his bone marrow cancer, Essential Thrombocythemia, a myeloproliferative neoplasm (a rare form of cancer).

31. In the medical textbook **"Current Medical Diagnosis and Treatment"**, (2016), by Maxine A. Papadakis, Stephen J. McPhee, and associate editor Michael W. Rabow, there are two pertinent descriptions concerning Furosemide (Lasix).

   1) Geriatric disorders, written by G. Michael Harper, M.D., Bree Johnston, M.D., and Seth Landefeld, M.C., page 466, regarding Furosemide (Lasix): "Diuretic; Dosage 10-80Mg; Onset 15 minutes; Duration 4 hours. Side Effect: Risk of excessive diuresis (production of urine).

   2) Urinary Incontinence: Excess urinary output: Page 65: "Escess urinary output may overwhelm the ability of an older person to reach the toilet in time. In addition to **diuretics**, common causes include... disorders associated with peripheral edema, with it's associated heavy nocturia when previously dependent legs assume a horizontal position in bed."

32. The day of the event described herein began as described at line item #30 above, with the Plaintiff arising and preparing

for a 7:00AM work call. The Plaintiff was working in the electric shop inside the facilities maintenance building.

33. On the day in question, a dense fog overwhelmed the compound, so all work was delayed until the fog lifted, and all inmates were kept inside their units. The Plaintiff stayed in his room reading after dressing and taking all his meds, which included the 40Mg dose of Furosemide (Lasix). Several times over the next 2 hours, the Plaintiff got up and releived himself to release excessive bladder pressure. At approximately 9:00AM, the fog had still not cleared, and, sleepy from reading, the Plaintiff fell asleep.

34. At precisely 9:30AM (the Plaintiff looked at his watch), Officer Ngo announced on the intercom a resumption of "normal operations", including a work call for all departments. The Plaintiff quickly arose, threw on his jacket, and grabbed his personal possessions he normally takes to work. Plaintiff was immediately overcome with an extremely strong need to urinate. The Plaintiff's cube (room) is approximately 135 feet from the restrooms, which was in the direction of the building exit. As the Plaintiff approached the restrooms, the urge became stronger and stronger. The Plaintiff approached the restrooms at about 9:32AM.

35. As Plaintiff arrived at the restroom entrance, almost simultaneously, Unit Manager D. Willis approached the restroom entrance from the opposite direction. Unit Manager Willis was motioning with his hands and telling inmates to go back to their cubes. The Plaintiff was experiencing such an urgent need to urinate that he failed to address Unit Manager Willis, and proceeded past Unit Manager Willis to his left, into the restroom. The Plaintiff went into the third stall, which was the first stall with a working latch on the stall door.

11

36. The Plaintiff entered and latched the stall door, as he always does without exception as a matter of modesty. Plaintiff attempted to urinate quickly so he could return to his cube, in response to Unit Manager Willis's order.

37. While attempting to begin a stream, sometimes a difficult matter for a 60-year-old, an unknown and unidentified person began rapping on the restroom stall door and asking the Plaintiff to return to his cube. Other inmates in the restroom overheard this, but were not asked to go back to their cubes. The Plaintiff was embarrassed and humiliated, which added additional time to begin urinating. The person rapping on the stall door did not identify themself. The Plaintiff, embarrassed and nonplussed, could not gather his wits to acknowledge and respond to the unknown person on the other side of the stall door.

38. On exiting the restroom area, Plaintiff was confronted by Unit Manager Willis, who asked the Plaintiff why he didn't "obey his order". The Plaintiff told Unit Manager Willis that: "I take water pills, and I had to use the restroom", whereupon the Plaintiff walked quickly back to his cube. As soon as the Plaintiff entered his cube, the event was cleared.

39. As the Plaintiff walked towards his cube, he overheard an unknown guard ask Mr. Willis: "Do you want me to write him up?".

40. Plaintiff believes that disciplinary write-ups should be reserved for serious infractions, not as a means to sadistically punish senior citizens who have a genuine issue of incontinence. It is unconscionable to force a man to make a decision to follow orders and urinate on himself and the floor instead of using a toilet six feet away from where he is standing, but that is what Unit Manager Willis attempted to get the Plaintiff to do; force the Plaintiff to urinate on himself and the floor.

12

41. In retrospect, the issue at hand was that the guard in the fully-windowed room at the front of the unit had placed her* walkie-talkie down on her desk, where she forgot about it. After 5 minutes, the radio sensed no movement, so it sent out a "silent alarm". Unit Manager Willis describes this event as a "body alarm" to artificially intensify the perceived threat of such an event.

42. When the alarm went off, Unit Manager Willis, who was about 40 feet away in a separate office, exited his office, and, walking directly past the female officer* in her office, where he had a complete and total view that she was oblivious to the alarm and absolutely uninjured, Mr. Willis continued to treat the spurious event as an actual emergency, possibly for the purpose of training the guards.

43. The Plaintiff was a professional firefighter for 20 years with the City of Myrtle Beach. Such alarms are not dissimilar to false alarms that fire departments commonly respond to. The proper response would have been to terminate the response as soon as it was realized that the alarm was false, to prevent unnecessary injuries to inmates as well as the responding guards. However, it is difficult to explain this to someone who holds a hammer and sees everything as a nail that must be knocked in. If Unit Manager Willis had terminated the response as soon as he became aware that there was no injured guard, the event petitioned in the instant motion would never have occurred.

44. The following day, the Plaintiff was summoned to the Lieutenant's office, where he received a disciplinary action report. Two lieutenant's names appear on the report, Lt. Ngo and Lt. "H. Cinter" (illegible). The unknown Leiutenant told the Plaintiff: "You should have used the bathroom on the floor, someone would have cleaned it up." This is a poor example of how to respond to a 60-year old with chemically-induced incontinence, indicative of careless indifference.

* Officer McDowell                13

45. The Plaintiff asked for and received a UDC (Uniform Disciplinary Committee) hearing (previously described) on March 1, 2019. During the hearing, the Plaintiff attempted to present copies of the Americans with Disabilities Act to Counselors J. Wade and A. Williams, but they would not accept or look at them. When the Plaintiff explained that Unit Manager Willis had intentionally omitted that the Plaintiff told him "I take water pills" from his report, Counselor Wade told the Plaintiff "Who do you think we're going to believe, an inmate or one of our own?".

## ANALYSIS

46. The Plaintiff alleges that the disciplinary action was taken against him unethically and amorally in a manner so as to deny the Plaintiff the ability to conduct an innate human function, which was greatly accellerated by his known ingestion of an enhancing pharmaceutical drug, Lasix/furosemide, a powerful diuretic.

47. The Plaintiff alleges that the disciplinary action was in retaliation for the Plaintiff having a disability and inability to "hold his urine" on command. See **Lamont Shephard v. T. Quillen; J. Wise**, 840 F.3d 686 (CA9, 2016).

    "When a prisoner claims retaliation, courts strike this balance by requiring him to show that:
    1) A state actor took some adverse action,
    2) because of,
    3) the prisoner's protected conduct, that such action
    4) chilled his exercise of his [First Amendment rights] and,
    5) the action did not reasonably advance a legitimate correctional goal.

48. **42 USC § 1983** requires a Plaintiff to show a causal connection between a defendant's retaliatory animus and subsequent injury in any sort of retaliation action. The injury caused to the

14

Case 5:20-ct-03189-FL   Document 1   Filed 05/29/20   Page 14 of 20

Plaintiff in the instant case is that the wrongful disciplinary action may impede his early release to home confinement pursuant to the First Step Act. Disciplinary infractions are an affirmative reason to deny home confinement.

49. "To succeed on his claim, Plaintiff must allege facts sufficient to demonstrate that the alleged retaliatory act "was taken in response to the exercise of a constitutionally protected right **or** that the act itself violated such a right." **Adams v. Rice**, 40 F.3d 72 at 75 (4th Cir. 1994).

The Plaintiff alleges that innate, natural bodily functions are a protected right, as a matter of life itself.

50. Prison officials may not abuse a valid procedure as a cover or ruse to silence and punish an inmate. See **Shepard v. Quillen**, 840 F.3d 686 at 694 (CA9, 2015), citing **Bruce v. Yist**, 351 F.3d 1283 (CA9 2003).

Unit Manager Willis's misplaced disciplinary scheme leaves no room for a valid disability. A jury might be best suited to determine the reasonableness of Unit Manager Willis's conduct in light of the factual context in which it took place. His actions:
> "...failed to reasonably advance a legitimate correctional goal."
> **Rhodes v. Robinson**, 408 F.3d 559, 567-68 (9th Cir. 2005); **Johnson-El v. Beck**, 2011 U.S. Dist. LEXIS 37582 (4th Cir. March 25, 2011, citing **Rhodes v. Robinson** (supra).

51. "A jury could certainly find that the threat of [a disciplinary write-up] would chill a "person of ordinary firmness" from complaining about officer misconduct." **Rhodes** (supra), 408 F.3d at 569.

52. "Prison officials may not defeat a retaliation claim on summary judgement simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation for a Constitutional right." **Bruce v. Yist**, 351 F.3d 1282, 1289 (9th Cir., 2003).

15

53. The Plaintiff alleges that Unit Manager Willis's order impermissibly required him to make a choice between urinating into a toilet or on himself and the floor, humiliating and embarrassing himself in front of hundreds of other inmates. He attempted to unreasonably delay chemically-induced urination, which could have damaged the Plaintiff's already-damaged kidneys. The Plaintiff is **Chronic Kidney Disease Stage-3**, and currently functions with 1/2 of his right kidney and 2/3 of his left kidney. (Essentially slightly more than one kidney.)

54. Unit Manager Willis's actions were "so obvious that any prison official involved in enforcing it should have known he was breaking the law." **Sorrels v. McKee**, 290 F.3d 965 at 971 (9th Cir. 2002).

55. The Plaintiff fully completed the Administrative Remedy Process in good faith, however, his issues were not addressed in good faith. Responses were curt, terse, and failed to address the issues complained of. Staff acknowledged that the Plaintiff does, in fact, take Furosemide (Lasix), but disregarded the effects of this medication in their responses. In fact, it was clear from staff responses at all levels that they were merely "going through the motions" with no thoughts of countermanding Unit Manager Willis's unlawful disciplinary action, and did so with little to no investigation. Each named staff member had a hand in meting out the punishment by complicity and refusal to withdraw the disciplinary action from Plaintiff's file.

## CONCLUSION

56. It is clear that Unit Manager Willis, etal., abused their discretion by punishing and/or allowing the Plaintiff's punishment to stand, even though the Plaintiff was tending to an issue of incontinence directly related to his disability. The Plaintiff was disciplined without warning, and without the required "reasonable modification to rules, policies, and practices" mandated by the Americans with Disabilities Act, **42 USC § 12131(2)**.

16

57. Higher level staff seems undaunted and undeterred by the requirements specified in the Americans with Disabilities Act, and seem unaware of the concessions required by law in dealing with disabled persons.

58. Plaintiff asserts that named defendants are vicariously liable for the acts, commissions, and/or omissions of Unit Manager D. Willis fully as though the aforementioned defendants performed the acts or omissions themselves. In the alternative, executive staff is responsible for the carelessly indifferent acts or omissions of subordinate executive staff who are agents, employees, or servants of superior executive staff. Staff failure to oversee and supervise Unit Manager D. Willis with respect to his interaction with the Plaintiff resulted in his carelessly indifferent decision to unlawfully punish the Plaintiff in contraindication of protections implemented by the Americans with Disabilities Act and the Rehabilitation Act. The Americans with Disabilities Act specifically enumerates the Plaintiff's protected conduct for which his exercise thereof became the basis for his punishment.

59. In anticipation of the claim of qualified immunity, the Plaintiff cites Malley v. Briggs, 475 US 335, 341, 106 S. Ct. 1092, 89 L.Ed. 271 (1986), which states:
   Qualified Immunity does not protect "...the plainly incompetent or those who knowingly violate the law."

Throughout the Administrative Remedy process, the Plaintiff informed the Defendants of their duties under the Americans with Disabilities Act, but they refused to address this issue.

60. "...the contours of (the Plaintiff's) right against retaliation were "sufficiently clear that a reasonable official in (the Defendant's) position would have understood that what he (Defendants) were doing violated that right." Anderson v. Creighton, 483 US 635, 640, 107 S. Ct. 3034, 97 L. Ed. 523 (1987).

17

61. "There is no question that defendants acting in a supervisory capacity can be held liable in 1983 actions under a theory that it was their own actions which resulted in the Constitutional violations." See DiMarzo v. Cahill, 575 F.2d 15 (1st Cir. 1978).

62. "A prison official who uses a valid procedure as subterfuge to obscure retaliation cannot assert that [his action] served a valid penological purpose, even though [the prisoner] may have arguably ended up where he belonged." Bruce v. Yist, 351 F.3d 1283, 1289 (9th Cir. 2003) cited by Shepard v. Quillen; Wise, 840 F.3d 686 at 692 (CA9, 2016).

63. "The fact that a supervisor promotes a policy which infringes upon the Constitutional rights of an inmate can be the "affirmative link" contemplated by the Supreme Court in Rizzo. It is not necessary for 1983 liability that the [defendants] directed any particular action... only that they affirmatively promoted a policy which sanctioned the type of action which caused the violations." Duchesne v. Sugarman, 566 F.2d 817, 831, (2nd Cir. 1977).

64. "Promulgation of an offending policy or procedure amounts to sufficient personal participation in the Constitutional violation to give rise to individual liability on the part of the supervisory official." Waer v. Bonner, 621 F.2d 675 (5th Cir. 1980).

65. "A prisoner's misconduct does not strip him of his right to reasonable accomodations. Prison officials were aware of [Furgess'] disability and were deliberately indifferent by failing to..." accomodate Plaintiff's disability. Furgess v. Pennsylvania Department of Corrections, 933 F.3d 285 (3rd Cir. 2019).

66. "Plaintiff was deprived of Due Process in violation of the 14th Amendment. In the prison disciplinary setting, an inmate is entitled to only a minimal standard to due process. The Plaintiff was not notified of his right to call witnesses, and his documentary evidence was refused. Institutional safety was not in danger of being jeopardized if Plaintiff had been permitted to call a witness." See Wolff v. McDonnell, 418 US 539, 563-576 (1974)

67. The Plaintiff has a witness who will testify that the Plaintiff was the only inmate out of three in the restroom who was singled out for punishment.

68. The Plaintiff asserts that the named Defendants are vicariously liable for the acts, commissions, or omissions of Unit Manager D. Willis fully as though the aforementioned defendants performed the acts or omissions themselves. In the alternative, executive staff is responsible for the carelessly indifferent acts or omissions of subordinate executive staff who are agents, employees, or servants of superior executive staff. Staff failure to oversee and supervise Unit Manager D. Willis with respect to his interaction with the Plaintiff resulted in his carelessly indifferent decision to unconstitutionally punish the Plaintiff in contradiction of protections implemented within the **Americans with Disabilities Act** and the **Rehabilitation Act**, which specifically enumerate the Plaintiff's protected behavior for which he was punished.

69. Pursuant to the **Prison Litigation Reform Act**, the Plaintiff seeks the maximum award of compensatory and punitive damages permitted by law as a deterrent to FBOP staff abuse of disabled prisoners, and requests that this Honorable Court require FBOP staff to receive training pertaining to the proper means of interacting with disabled inmates to deter future abuse of process by FBOP staff responsible for responding to Administrative Remedy requests.

70. Plaintiff further asks this Honorable Court to **ORDER** the FBOP to rescind and expunge the unconstitutional Disciplinary Action Report from the Plaintiff's file(s), and issue a consent decree to prevent future punishment of the Plaintiff's exercise of his bodily functions in response to his disability, as well as prohibiting retaliatory measures such as transfer to other FBOP installations, such that such a transfer would be deemed prima facie evidence of retaliation of the type prohibited by law.

19

Case 5:20-ct-03189-FL Document 1 Filed 05/29/20 Page 19 of 20

I certify that the aforegoing is true and correct under penalty of perjury and statute 28 USC § 1746, executed this day:

_____  _____
Webster Douglas Williams, III        Date 4/7/20

_____  _____
Witness                              Witness

Signed in the presence of two witnesses due to the unavailability of a Notary Public.

Katie Hunt 4-7-20
Notary Public

My Commission expires 3-25-2021

[Notary Seal: KATIE HUNT, DURHAM COUNTY, NORTH CAROLINA, NOTARY PUBLIC]